IOM GRAIN, LLC, f/k/a     )
H&B CONDITIONING, LLC,     )
                                 )
     Plaintiff,               )
                                 )
     v.                    )     CAUSE NO.: 1:10-CV-337-TLS
                                 )
ILLINOIS CROP IMPROVEMENT     )
ASSOCIATION, INC.,            )
                                 )
     Defendant.             )

## OPINION AND ORDER

This matter is before the Court on Defendant Illinois Crop Improvement Association, Inc.'s Motion for Summary Judgment [ECF No. 71], filed on December 13, 2013. Also pending is Plaintiff IOM Grain, LLC's Motion to Strike [ECF No. 80] various exhibits the Defendant offered in support of the Motion for Summary Judgment. For the reasons stated in this Opinion and Order, the Court will deny the Defendant's Motion for Summary Judgment and deny the Plaintiff's Motion to Strike.

## PROCEDURAL BACKGROUND

The Plaintiff filed this action in the Jay Circuit Court, Jay County, Indiana, on August 19, 2010 [ECF No. 1], alleging (1) breach of contract against ZEA Global Seeds ("ZEA"); (2) fraudulent misrepresentation against ZEA and the Defendant; (3) constructive fraud against the Defendant; (4) negligent misrepresentation against the Defendant; (5) breach of fiduciary duty against the Defendant; and (6) civil conspiracy against both ZEA and the Defendant. The Defendant removed the case to this Court pursuant to 28 U.S.C. §§ 1332, 1441(a) and 1446 on

September 29, 2010 [ECF No. 2], and filed an Amended Notice of Removal [ECF No. 8] on October 12, 2010, providing more complete jurisdictional information. The Defendant filed a Motion to Dismiss on December 3, 2010 [ECF No. 14]. The Plaintiff responded by filing an Amended Complaint on January 27, 2011 [ECF No. 22], and the Court therefore denied the original Motion to Dismiss as moot on February 3, 2011 [ECF No. 24]. On February 28, 2011, the Defendant filed a Motion to Dismiss [ECF No. 26]. On October 20, 2011, the Court issued an Opinion and Order [ECF No. 34] granting dismissal of Plaintiff's claims for constructive fraud, negligent misrepresentation and breach of a fiduciary duty against the Defendant; while denying dismissal for Plaintiff's claims of breach of contract against ZEA, and fraudulent misrepresentation and civil conspiracy against ZEA and the Defendant.

Due to difficulty in obtaining service of process on ZEA, the Plaintiff filed a motion on January 10, 2012, to dismiss its claims against ZEA without prejudice [ECF No. 38]. On January 27, 2012, the Court issued an order granting Plaintiff's dismissal of its claims against ZEA [ECF No. 39].

On December 13, 2013, the Defendant filed a Motion for Summary Judgment [ECF No. 71], along with a corresponding Brief in Support of Defendant's Motion for Summary Judgment [ECF No. 72]. The Plaintiff responded on January 27, 2014 [ECF No. 77], and the Defendant replied on February 10, 2014 [ECF No. 85].

On January 27, 2014, the Plaintiff also filed a motion, pursuant to Federal Rule of Civil Procedure 12(f) [ECF No. 80], to strike various exhibits the Defendant offered in support of the Motion for Summary Judgment, along with a corresponding Brief in Support of Plaintiff's Motion to Strike [ECF No. 81]. The Defendant responded on February 10, 2014, and the Plaintiff

replied on February 19, 2014.

**FACTUAL BACKGROUND**

This case arises from a failed contractual relationship. The Plaintiff is an Indiana limited liability company that supplies high quality non-GMO food grade soy beans and corn to domestic and international markets. The sole member of the Plaintiff is Ramon Loucks, who has been at all times relevant to this lawsuit—and remains—a citizen of Indiana. ZEA is an Argentinian corporation that provides winter season soy bean nursery services at farms in Argentina. Finally, the Defendant is an Illinois corporation that provides seed certification and field services to agricultural companies throughout the world.

Complete diversity exists because no member of the Plaintiff is a citizen of the same State as the Defendant, and the amount in controversy exceeds $75,000. (ECF No. 2; ECF No. 8.)

In early 2008, the Plaintiff and the Defendant discussed the possibility of doing business with some of the Defendant's business partners. Dennis R. Thompson, CEO of the Defendant, introduced the leadership of the Plaintiff and the leadership of ZEA through a telephone conversation and email on or about April 8, 2008.[1] In his email, Thompson stated that ZEA was a "topnotch concern[] with whom [the Defendant] has great respect." (Pl. Ex. A, ECF No. 22–1.) He then made specific statements about ZEA's organization and capabilities, outlining a potential arrangement between the Plaintiff and ZEA. In the same email, he referred to ZEA as "ZEA Global Seeds via our Global Seed Solutions (GSS)." (*Id.*) Global Seed Solutions was

---

[1]Prior to the contract at issue, the Plaintiff had sought business referrals from Thompson and conducted business related to genetic testing services with the Defendant.

incorporated on August 5, 2008, with the Defendant and ZEA as the sole shareholders. (*Id.*; Pl. Ex. D, ECF No. 22–4.) In the April 8 email, Thompson noted that under a proposed deal, ZEA would "compensate [the Defendant] under the GSS agreement." (Pl. Ex. A.)

In the late spring and early summer of 2008, the Plaintiff and ZEA engaged in negotiations for ZEA to provide the Plaintiff's needs for high quality non-GMO food grade quality soybeans. As part of the proposed contract, ZEA would commit nearly $1 million to secure land; pay for necessary inputs and services; and grow, harvest and deliver soy beans to the Plaintiff. The Defendant—through Thompson—was involved in these negotiations. As part of this process, Thompson conducted meetings with ZEA executives individually and jointly with executives from the Plaintiff. ZEA provided an initial quote on June 20, 2008, which included a request for the Plaintiff to make an initial pre-payment. The quote was unacceptable to the Plaintiff, and negotiations continued. On June 23, 2008, ZEA told the Plaintiff via e-mail that a pre-payment was necessary because "all lines of credit have disappeared."[2] (Pl. Ex. 52, ECF No. 78–13.) On or about June 25, 2008, ZEA requested a pre-payment of $500,000 from the Plaintiff. ZEA again referenced a lack of credit in Argentina. According to Loucks, he viewed ZEA's request as a negotiation tactic and not as a sign of financial trouble.[3] (Pl. Ex. 1 at

---

[2]The e-mail stated: "I suggest we discuss the payment proposal . . . with the current political situation in Argentina, all lines of credit have disappeared and we live in a cash-only business. The reason for the upfront payment . . . relates to the timing of our cash rent and major inputs deadlines." (Pl. Ex. 52, ECF No. 78–13.) According to Loucks, he interpreted "cash rent" as rent owed for farming real estate, and "major inputs deadlines" as deadlines to pay for crop inputs (e.g., "seed, fertilizer, fuel, machinery, labor, herbicides."). (Pl. Ex. 1 at 114–15, ECF No. 78-1.)

[3]Marcelo Queijo, President of ZEA at all times relevant to the lawsuit, testified that the statements made by ZEA could be interpreted as a method of negotiation. According to Queijo, the request for a pre-payment "was [] part of [ZEA's] negotiating the deal" and that ZEA "didn't enter into deals unless our clients did commit some financial support upfront." (Pl. Ex. 2 at 134, ECF No. 78–2.) Queijo also noted that pre-payments are customary for the type of contract at issue. (*Id.* at 36.)

124.) The Plaintiff rejected ZEA's request for a pre-payment.

During subsequent negotiations, ZEA continued to request a pre-payment from the Plaintiff so that ZEA could begin performing under the proposed contract. By July 2008, Loucks said he became more amenable to ZEA's request; but at the same time, he became concerned with ZEA's financial condition. As a result, Loucks inquired of Thompson regarding ZEA's financial condition; specifically, whether ZEA was "good for the money" that ZEA was requesting from the Plaintiff. (*Id.* at 176.) Thompson said he was unable to provide specific financial information about ZEA because of a confidentiality agreement. However, Thompson provided assurances that ZEA could perform under the proposed contract. Specifically, Thompson said that ZEA was "capable of doing this deal" and "capable of handling this transaction." (*Id.* at 195; Def. App. A at 21, ECF. No. 73.) Thompson testified that ZEA's "ability to get financing" was included as part of his assurances.[4] Neither party disputes that Thompson was aware of the specific terms of the proposed contract. According to Loucks, Thompson's assurances were provided in July 2008.

On or about July 28, 2008, ZEA informed the Plaintiff that it would need a pre-payment that same week. The Plaintiff responded that it required financial documentation from ZEA before moving forward. The Plaintiff requested two years of balance sheets, two years of profit and loss statements, and the prior year's tax filings.

On July 29, 2008, Thompson sent an e-mail to Tom Growmark, the Chairman of the Defendant's Board of Directors, requesting authorization to forward ZEA the needed funds. The

---

[4]Thompson's testimony provided: "[Question:] Did you ever discuss ZEA's ability to get financing []? [Answer:] Only in the context could they handle the overall project, and that would include the total package." (Pl. Ex. 3 at 174, ECF No. 78–3.)

e-mail stated: "ZEA is tapped out for immediate cash as their cashflow for [the] upcoming season begins in 15 days."[5] (Pl. Ex. 21, ECF No. 78–8.) When asked about this e-mail, Thompson testified that ZEA's "cash flow was not what they had anticipated" and as a result, "they were looking for cash flow support." (Pl. Ex. 3 at 186.) Thompson told Growmark that a successful deal between the Plaintiff and ZEA would be "really big" for the Defendant, resulting in a $50,000-70,000 commission, and commissions on future business between ZEA and the Plaintiff, and would "demonstrate [the Defendant's] capabilities to build unique business relations and opportunities." (Pl. Ex. 21.) Thompson's e-mail also noted the risks of the transaction.[6]

The Defendant then forwarded ZEA the needed funds without the Plaintiff asking it to do so. In a July 30 email, Thompson informed the Plaintiff that the Defendant would forward the funds to ZEA "to pull this project together this week." (Pl. Ex. B, ECF No. 22–2.) In his email, Thompson referred to ZEA as "our strategic partner," and further stated that "ICIA has put a pony in the race!!!" (*Id.*) Loucks responded—via email—by thanking Thompson for his action. (*Id.*)

On August 2, 2008, ZEA provided the requested financial information to the Plaintiff,

---

[5]Thompson testified that he never used the phrase "tapped out for cash" during his discussions with the Plaintiff, but that ZEA's cash requirements were "general knowledge" to the negotiating parties: [Question:] Did you ever tell [Plaintiff] that ZEA is tapped out for immediate cash? [Answer:] I don't recall saying it in those terms. But in the general nature of the entire business discussion, it was totally understood that this was a very unique and larger project and those projects have to be funded within their merit . . . if [pre-payments] weren't forthcoming, that certainly would create some disruption . . . [s]o the idea of that was very, very common and generally discussed and known by everyone." (Pl. Ex. 3 at 193.)

[6]Thompson's e-mail stated: "If ZEA should stiff [the Defendant] in the near term it will kill prospects of launching GSS, Inc. and would happen prior to the time we would capitalize GSS, Inc." (Pl. Ex. 21.)

including audited financial information for 2006 and 2007; and unaudited financial information for 2008, which ran through June. (*Id.*; Pl. Ex. C, ECF No. 22–3; Pl. Ex. 54, ECF No. 78–14; Pl. Ex. 55, ECF No. 78–15.) However, according to Loucks' testimony, Thompson said he possessed financial information that was not reflected in the requested financial documents, and that he could not disclose the information due to the confidentiality agreement.[7] (Pl. Ex. 1 at 201.) After receiving the assurances of Thompson and reviewing the requested financial documents, Loucks concluded that ZEA was a "mildly profitable" company that could perform under the contract. (*Id.* at 192.)

On August 4, 2008, ZEA sent the Plaintiff a "Letter of Intent" detailing, in part, a proposed obligation for the Plaintiff to make a $100,000 pre-payment—$50,000 to be paid to ZEA and $50,000 to be paid to the Defendant as reimbursement for their pre-payment "in behalf" of the Plaintiff. (Pl. Ex. E, ECF. No. 22–5). On August 6, ZEA also informed the Plaintiff that ZEA owed $7,000 to the Defendant, and requested that the Plaintiff—instead of paying ZEA directly—forward funds to the Defendant to cancel ZEA's outstanding balance. (Pl. Ex. C.) Also on August 6, Thompson informed the Plaintiff via email that ZEA "really could use the comfort of the signed document and transfer of monies." (Pl. Ex. D) On August 7, the Plaintiff sent a signed Letter of Intent to ZEA; and on August 15, sent the $57,000 pre-payment to the Defendant as requested by ZEA. (Pl. Ex. E.) In addition to the $57,000 pre-payment to the Defendant, the Plaintiff eventually provided a pre-payment of $93,000 to ZEA—$150,000 in

---

[7]Loucks' testimony provided: [Question:] Did you think that [Thompson] knew more about ZEA's financial condition than what's reflected in [the requested financial documents of ZEA]? [Answer: Thompson] said he did. [Question:] What did he tell you that he knew? [Answer:] That he couldn't tell us.

total.[8]

In September 2008, representatives from ZEA, the Plaintiff and the Defendant met in Argentina to finalize a contract. Thompson participated in the discussions, meeting with ZEA executives alone and with executives from ZEA and the Plaintiff together. On September 16, 2008, ZEA and the Plaintiff signed a contract for ZEA to provide the Plaintiff with soy beans between April and October 2009. (Pl. Ex. F, ECF No. 22–6.) The contract is written on the Plaintiff's letterhead, and purports to be "the final, complete and exclusive statement of the agreement between the parties." (*Id*.) The Defendant was not a party to the contract.

According to Loucks, following the signing of the contract, a dispute arose between the Plaintiff and ZEA regarding an overdue payment for crop inputs. In December 2008, following a meeting with ZEA representatives, Loucks said he began having concerns regarding ZEA's "cash flow problems." (Pl. Ex. 1 at 278.)

In January 2009, Loucks and Thompson traveled to Argentina to review ZEA's operations. During this visit, Loucks was notified by ZEA representatives of "cash flow problems" and general financial difficulties at ZEA that may impact performance of the contract. (*Id*. at 282.) During this time period, Loucks said he also became aware of weather conditions caused by heat and drought that could potentially impact crop yields. (*Id*. at 254.) In March 2009, the Defendant loaned $40,000 to ZEA for assistance in performing the contract. The Defendant did not disclose the loan to the Plaintiff. Thompson said he began having concerns about the success of the contract at this time.

---

[8]Thompson testified that he understood the Plaintiff's pre-payment to be a form of credit: [Question: The Plaintiff was] providing money to ZEA that ZEA was required to pay back later; correct? [Answer:] That was my understanding." (Pl. Ex. 3 at 310.)

In May 2009, the Plaintiff requested updated financial documents from ZEA regarding its financial condition. According to the Plaintiff, the requested financial documents indicated that ZEA lost money between July and September 2008. (Pl. Ex. 66., ECF No. 78–17.) Queijo did not dispute the accuracy of the financial information sent to the Plaintiff.

In summer 2009, a contractual dispute arose between ZEA and the Plaintiff concerning export taxes. ZEA was also unable to deliver the soy beans to the Plaintiff due to a separate contract dispute with third-party growers.[9] As a result, the deal collapsed in late summer 2009. ZEA failed to complete the contract or reimburse the Plaintiff for its $150,000 pre-payment.

The Plaintiff's pending claims against the Defendant include fraudulent misrepresentation and civil conspiracy. The Plaintiff alleges financial damages as well as damage to credibility and reputation. (Am. Compl. ¶ 50.) The Defendant argues that, under Federal Rule of Civil Procedure 56, summary judgment is appropriate because no issues of material fact exist as to Plaintiff's remaining claims. (Def's Br. in Supp. of Summ. J., ECF No. 72.) The Plaintiff argues that summary judgment is not appropriate because the Plaintiff has offered sufficient evidence to create issues of material fact. (Pl.'s Br. in Opp. to Summ. J., ECF No. 77.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[9]The record shows that third-party growers refused to release the soy beans to ZEA due to a disagreement relating to payment terms. According to Queijo's deposition testimony, the growers refused to release the soy beans because ZEA was unable to provide a timely payment. (Pl. Ex. 2 at 188.)

Civ. P. 56(a). Summary judgment is the moment in litigation where the non-moving party is required to marshal and present the court with evidence on which a reasonable jury could rely to find in his favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court should only deny a motion for summary judgment when the non-moving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citing *United States v. 5443 Suffield Terrace*, 607 F.3d 504, 510 (7th Cir. 2010); *Swearnigen–El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 859 (7th Cir. 2010)). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. A court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Material facts are those that are outcome determinative under the applicable law. *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *see Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (noting that "summary judgment cannot be used to resolve swearing contests between litigants").

As the Court addresses the legal issues presented by the Defendant's Motion for Summary Judgment and analyzes the facts under the governing procedural and substantive law, the Court will consider the admissibility of the Defendant's statements, determine whether there

are any irrelevant, inadmissible, conclusory, or speculative assertions that should be disregarded, and deal with them accordingly. To the extent that any of the Defendant's statements would be inadmissible if the Defendant were to offer them at trial, the Court will not consider them. Where exhibits do not go to facts that are outcome determinative under the applicable law, the Court will likewise ignore them. Additionally, the Court will operate under the principle that "it is simply not true . . . that if a litigant presents an overload of irrelevant or nonprobative facts, somehow the irrelevancies will add up to relevant evidence." *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001). Consequently, there is no need to strike any part of the Defendant's exhibits, and the Court will deny the Plaintiff's Motion to Strike [ECF No. 80].

## DISCUSSION

### I. Choice of Law

The Court previously determined in its Opinion and Order Granting in Part and Denying in Part the Defendant's Motion to Dismiss [ECF No. 34], that the Court will apply the substantive law of the forum state—Indiana—to this case. *See Gould v. Artisoft, Inc.*, 1 F.3d 544, 549 n.7 (7th Cir. 1993) ("Where the parties have not identified a conflict between the two bodies of state law that might apply to their dispute, we will apply the law of the forum state.").

### II. Fraudulent Misrepresentation

In Indiana, a plaintiff asserting an action for fraudulent misrepresentation must prove the following five elements:

> (1) the defendant made false statements of past or existing material facts; (2) the defendant made such statements knowing them to be false or recklessly without

11

knowledge as to their truth or falsity; (3) the defendant made the statements to induce the plaintiff to act upon them; (4) the plaintiff justifiably relied and acted upon the statements; and (5) the plaintiff suffered injury.

*Desimone v. Quicken Loans, Inc.*, No. 1-09-cv-01421-WTL-MJD, 2011 WL 900947, at *2 (S.D. Ind. Mar. 15, 2011) (citing *Hizer v. Holt*, 937 N.E.2d 1 (Ind. Ct. App. 2010)); *see also Tru-Cal, Inc. v. Conrad Kacsik Instrument Sys., Inc.*, 905 N.E.2d 40, 44–45 (Ind. Ct. App. 2009) (listing elements of fraud in the inducement).[10]

The Defendant argues that the Plaintiff has failed to put forth sufficient evidence on any of the five elements of its fraudulent representation claim to create a genuine issue of material fact. The Plaintiff argues that triable issues of material fact exist on all five elements of its fraudulent representation claim. Viewing the evidence in the light most favorable to the Plaintiff, and drawing reasonable inferences therefrom, the Court finds that the Plaintiff has provided sufficient evidence to survive summary judgment.

## A.     False Statements of Past or Existing Material Facts

The Defendant contends that the Plaintiff has not provided evidence of false statements of existing fact, but rather, generalized statements and opinions related to future occurrences.

The Plaintiff has submitted evidence that the Defendant's CEO, Thompson—at a time when the Plaintiff manifested concerns about ZEA's financial condition and ability to perform under the proposed contract—provided assurances that ZEA was "capable of doing this deal"

---

[10]The Court notes that Indiana courts have also articulated the elements of fraud without the requirement that the defendant made the fraudulent statement with the intent to induce the plaintiff to act. *See Heyser v. Noble Roman's Inc.*, 933 N.E.2d 16, 19 (Ind. Ct. App. 2010); *Loomis v. Ameritech Corp.*, 764 N.E.2d 658, 667 (Ind. Ct. App. 2002); *Wells v. Stone City Bank*, 691 N.E.2d 1246, 1250 (Ind. Ct. App. 1998).

and "capable of handling this transaction." Neither party disputes that Thompson was aware of the specific terms of the proposed contract; that ZEA required financing to perform the proposed contract, which required inputs of nearly $1 million; and that Thompson made his assurances at a time when the Plaintiff was contemplating a substantial pre-payment, which Thompson perceived to be a form of credit. Viewing the evidence in the light most favorable to the Plaintiff and drawing reasonable inferences therefrom, a reasonable jury may conclude that Thompson's statements entailed an assurance of ZEA's financial stability, including its creditworthiness.

The Defendant has cited a variety of cases for the proposition that generalized statements about financial health or future performance will not support a claim of fraud. But the Court is persuaded, viewing the evidence in the light most favorable to the Plaintiff, that a jury may conclude that the Plaintiff's evidence shows more than generalized statements about the financial health or future performance of ZEA. As the Court previously noted in its Opinion and Order Granting in Part and Denying in Part the Defendant's Motion to Dismiss [ECF No. 34], assurances of creditworthiness are not statements of a future occurrence. *See Nightingale Home Healthcare, Inc. v. Anodyne Therapy, LLC*, No. 1:06-cv-1435-SEB-JMS, 2008 WL 4367554, at *10 (S.D. Ind. Sept. 18, 2008) ("any representation made about the current status of [a potential future event] would have been a statement about a contemporaneous fact."). And they are not generalized statements or statements of opinion. *See Reginald Martin Agency, Inc. v. Conseco Med. Ins. Co.*, 478 F. Supp. 2d 1076, 1089 (S.D. Ind. 2007) (presently-existing facts are "susceptible to exact knowledge," which "includes unqualified guarantees") (internal quotation marks omitted); *Vaughn v. Gen. Foods Corp.*, 797 F.2d 1403, 1411 (7th Cir. 1986) ("An opinion is a subjective statement of belief 'on which no reasonable [person] should justifiably rely'"; "an

unqualified guarantee is 'an objective statement of fact' upon which reliance may be justified.")
(quoting *Whiteco Props. Inc. v. Thielbar*, 467 N.E.2d 433, 437 (Ind. Ct. App. 1984)). Instead,
statements of creditworthiness relate to a presently-existing condition, which is capable of
calculation.

To illustrate, the Court finds the reasoning in *Reginald Martin* to be persuasive. 478 F.
Supp. 2d 1076. In *Reginald Martin*, the plaintiff alleged that the defendant insurance company
made statements that it was "financially stable" and "profitable," *id.* at 1087, when in fact "it
was hemorrhaging millions of dollars." *Id.* at 1090. The court denied the defendant's summary
judgment motion because it found the defendant's statements to be actionable in fraud.
Thompson's statements are similar to the statements in *Reginald Martin*. At a time when the
Plaintiff manifested concerns regarding ZEA's financial condition, Thompson offered
unqualified guarantees that ZEA was able to perform the contract, which according to
Thompson's testimony, encompassed an assurance that ZEA could obtain financing. If the truth
is that ZEA was not creditworthy at the time the assurances were made, then Thompson's
statement was a false statement of material fact, and the Plaintiff's evidence is sufficient to
survive summary judgment.

Alternatively, the Defendant argues that the Plaintiff has failed to put forth evidence that
Thompson's statements were, in fact, false. The Defendant asserts that, at the time Thompson's
assurances were made, "ZEA's financial condition was such that it would have been able to do
the things reflected in [the proposed contract]." (Def. Br. in Supp. of Summ. J. at 12.) However,
the Plaintiff has submitted financial documentation from ZEA allegedly indicating that ZEA was
losing money between July and September of 2008—an apparent reversal from the Plaintiff's

prior appraisal of ZEA as a "mildly profitable" company. The Plaintiff has also submitted an e-mail sent by Thompson to the Chairman of the Defendant's Board of Directors on July 29, 2008, in which Thompson described ZEA as being "tapped out of cash," a characterization of ZEA's financial condition that, again, allegedly conflicts with the Plaintiff's prior appraisal of ZEA. When viewing the summary judgment record in a light most favorable to the Plaintiff, the Court cannot, as a matter of law, conclude that Thompson's statements were true when made.[11] Accordingly, the Plaintiff has submitted sufficient evidence to create a triable issue as to whether Thompson's statements were false.

## B.      False Statements Made Knowingly or Recklessly

Next, the Defendant argues that the Plaintiff has failed to show that Thompson's statements of existing material fact were made knowingly or recklessly.

Viewing the evidence in the Plaintiff's favor, a reasonable jury may conclude that Thompson knew or should have known that ZEA lacked the requisite financial stability to perform the contract. Thompson testified that, by August 2008, he was never told of ZEA's "financial problems." However, throughout Loucks' deposition testimony, he states that Thompson possessed financial information related to ZEA—before and after the signing of the parties' contract—that he was unable to disclose due to a confidentiality agreement. According

---

[11]The Defendant further argues that the contract failed "because of acts outside of the control of anyone." (Def. Br. in Supp. of Summ. J. at 11) ("[t]he mere occurrence of events that render a previous statement false in hindsight is simply not actionable."). However, the Plaintiff has submitted evidence to create a reasonable inference that, at the time Thompson made his assurances, ZEA lacked the requisite financial stability to perform the proposed contract. The separate question as to why the contract failed relates to causation, which the Court discusses below.

to Loucks, Thompson expressly stated that he possessed financial information not reflected in the financial documents sent to the Plaintiff in August 2008.

Aside from Loucks' testimony, other evidence shows that the extent of Thompson's knowledge is a material fact in dispute. At all times relevant to this lawsuit, the Defendant was a business partner and co-shareholder with ZEA via Global Seed Solutions, and Dennis Thompson was the Defendant's CEO. The Plaintiff has shown instances where the Defendant and ZEA exchanged information or transacted business related to the contract at issue, without a disclosure to the Plaintiff. Most notably, the Defendant provided a $40,000 loan to ZEA—with the express purpose of assisting with the performance of the contract—which was never communicated to the Plaintiff. The Defendant's business relationship with ZEA, coupled with Thompson's express statements regarding ZEA's financial condition, create a reasonable inference that, if in fact ZEA lacked the requisite financial stability, Thompson would have known that when he made the assurances.

Accordingly, a reasonable jury may conclude that Thompson knew, or recklessly disregarded, that his statements were false.


**C.      False Statements Made to Induce Plaintiff Action**

Next, the Defendant argues that the Plaintiff's evidence is insufficient to show that Thompson made the statements with the intent to induce the Plaintiff's action.

The Plaintiff has submitted evidence that ZEA and the Defendant, through Thompson, made persistent requests for the Plaintiff to provide a pre-payment and sign the proposed contract.  Just prior to the Plaintiff's signing of a "Letter of Intent," ZEA informed the Plaintiff

on or about July 28, 2008 that it needed a pre-payment that same week. And on August 6, after Thompson made his assurances to the Plaintiff, he informed the Plaintiff via email that ZEA "really could use the comfort of the signed [Letter of Intent] and transfer of monies." A reasonable jury may infer that Thompson's assurances were aimed at inducing the Plaintiff's commitment.

The Defendant argues that it had no financial incentive to induce the Plaintiff to commit to a failed contract. However, the Plaintiff need not show the Defendant's knowledge that the contract would fail. The Plaintiff need only show that the Defendant misrepresented an existing fact—ZEA's financial condition—to induce the Plaintiff's action. *See Desimone*, 2011 WL 900947, at *2 (S.D. Ind. Mar. 15, 2011) (citing *Hizer*, 937 N.E.2d 1).

Viewing the evidence in a light most favorable to the Plaintiff, a reasonable jury may conclude that the Defendant made false statements to induce the Plaintiff's actions.


**D.    False Statements Causing Justifiable Reliance and Plaintiff Action**

The Defendant further urges that the Plaintiff either did not rely on Thompson's statements about the financial health of ZEA, or if it did rely on such statements, its reliance was unreasonable because the Plaintiff made independent inquiries during the contract negotiations, requested specific financial information from ZEA, and personally viewed ZEA's operations in Argentina.

To support a fraud claim, the Plaintiff must plead that it actually relied on a fraudulent representation, and that its reliance was justifiable. *Hizer*, 937 N.E.2d at 5. "However, the reasonableness of a party's reliance generally becomes a question of fact where the record

evidence is susceptible [] to more than one interpretation." *Reginald Martin*, 478 F. Supp. 2d at 1090. Indiana courts have long held reliance unreasonable where a party blindly trusts another, where the facts are "equally open to the observation of both parties," and where the party claiming fraud, "had he exercised ordinary prudence, could have attained correct knowledge." *Pugh's IGA, Inc. v. Super Food Servs., Inc.*, 531 N.E.2d 1194, 1198–99 (Ind. Ct. App. 1988) (citation omitted). The Defendant cites many cases in support of these basic principles. But the evidence, when viewed in a light most favorable to the Plaintiff, shows that the question of reliance is not appropriate for determination on summary judgment.

The Defendant argues that the Plaintiff "devoted six and half months to doing its own due diligence" and "us[ed] every conceivable tool at its disposal," and therefore, it did not rely on Thompson's statements. (Def. Br. in Supp. of Summ. J. at 22). But Loucks testified that the Plaintiff did, in fact, rely upon Thompson's statements. According to Loucks, "the grain trade is based on referrals" and "reputations," and that assurances from "trusted individuals" is a common practice with the Plaintiff. (Pl. Ex. 1 at 37–38.) Furthermore, the context of the Plaintiff's alleged reliance is important. Loucks allegedly sought Thompson's assurances in July 2008, just prior to the Plaintiff's decision to make a prepayment and sign the contract. Because the Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts" on a summary judgment motion, the question here as to whether the Plaintiff relied on Thompson's assurances is a "job[] for a factfinder." *Pauley*, 337 F.3d at 770 (7th Cir. 2003); *see also Betaco, Inc. v. Cessna Aircraft Co.*, 32 F.3d 1126, 1138 (7th Cir. 1994); *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1041 (7th Cir. 1993).

A material dispute also arises regarding the reasonableness of the Plaintiff's reliance. The

record shows that Thompson is a seasoned executive to a corporation that supplies services to agricultural companies around the world—a professional stature known to the Plaintiff at all relevant times of this lawsuit. The Plaintiff also knew that the Defendant was a business partner of ZEA. When accounting for Thompson's acumen in the international agriculture business, the Defendant's business relationship with ZEA, and Thompson's statements related to undisclosed financial information, a reasonable inference is created that Thompson may have possessed superior knowledge of ZEA's financial condition. The Defendant argues that the Plaintiff's reliance is unreasonable because Loucks is a "highly experienced businessperson with decades of experience in domestic and international agricultural business." (Def. Br. in Supp. of Summ. J. at 20.) But even so, Thompson testified that the Plaintiff lacked the "background and understanding of working in the international arena on the production, the management, and the business arrangements that were required in Argentina." (Pl. Ex. 3 at 110.) On this record, a reasonable jury may conclude that information to resolve the truth or falsehood of Thompson's statements was not "equally open to the observation of both parties," *Pugh's IGA*, 531 N.E.2d at 1199, and thus, Plaintiff's reliance on Thompson's statements was reasonable.

Alternatively, the Defendant argues that ZEA put the Plaintiff on notice of its cash requirements throughout the contract negotiations. The Defendant is correct that a party cannot receive information rebutting the misrepresentation, then continue to rely on the misrepresentation, and still claim a fraudulent inducement. *Peterson Indus., Inc. v. Lake View Trust & Sav. Bank*, 584 F.2d 166, 168–69 (7th Cir. 1978); *Dixie-Portland Flour Mills, Inc. v. Nation Enters.*, 613 F. Supp. 985, 990 (N.D. Ill. 1985). However, the evidence does not lead to a conclusion that the Plaintiff received information rebutting Thompson's assurances. After

reviewing ZEA's financial documents, Loucks determined that ZEA was "mildly profitable" and capable of performing under the proposed contract. Although ZEA notified Loucks of its cash requirements due to the credit situation in Argentina, Loucks perceived ZEA's cash requests as a negotiation tactic—a perception that was validated by ZEA's President during his deposition testimony. Alternatively, a reasonable jury may also find that ZEA's representations related to issues unique to Argentina's credit market, as opposed to issues related to ZEA's overall financial condition.

Because the Court "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party," *Bellaver*, 200 F.3d at 491–92, the Court finds that the Plaintiff has submitted sufficient evidence to create a triable issue of material fact on whether its reliance was reasonable.

### E.     False Statements Caused Plaintiff Injury

Lastly, the Defendant argues that the allegedly false statements did not proximately cause the Plaintiff's injury. A tortious act is the proximate cause of an injury if the injury is a "natural and probable consequence which, in light of the circumstances, should reasonably have been foreseen or anticipated." *City of Portage v. Lindbloom*, 655 N.E.2d 84, 86 (Ind. Ct. App. 1995) (citing *McKinney v. Public Service Co. of Indiana, Inc.*, 597 N.E.2d 1001, 1005 (Ind. Ct. App. 1992)). Proximate causation is "generally an issue for the trier of fact and may be decided as a matter of law only when the facts are undisputed and lead to but a single inference." *PNC Bank Nat. Ass'n v. Pence*, 2010 WL 3947516 (S.D. Ind. 2010) (citing *Palmer & Sons Paving, Inc. v. N. Ind. Pub. Serv. Co.*, 758 N.E.2d 550, 557 (Ind. Ct. App. 2001))).

The Plaintiff has submitted evidence that, prior to making a pre-payment and signing the contract, the Plaintiff relied on Thompson's assurances of ZEA's ability to perform the contract. According to Loucks' testimony, but for Thompson's assurances, the Plaintiff would not have provided a pre-payment or signed the contract. The Plaintiff has also submitted evidence to show a reasonable jury that ZEA's failure to perform was forseeable. Thompson's e-mail to the Defendant's Board Chairman described ZEA as being "tapped out for cash" and explicitly referenced the risk of providing a loan to ZEA.

The Defendant contends, nonetheless, that unforeseeable events—namely, economic conditions, weather patterns, and the actions of third parties—were the actual causes of the failed contract and Plaintiff's alleged damages. But the Defendant also appears to admit that ZEA would have performed the contract if third-party growers had released the soy beans to ZEA. (Def. App. A at 21.) Both parties have offered conflicting evidence to explain the circumstances surrounding the grower's actions. The Plaintiff has submitted evidence to show that the third-party growers' actions were spurred by ZEA's financial condition; specifically, ZEA's inability or perceived inability to pay the growers. Given this record, the forseeability of damages is a material fact that cannot be resolved at the summary judgment stage.

After examining the summary judgment record, the Court finds the Plaintiff has submitted sufficient evidence to create triable issues of fact as to whether the Defendant committed fraudulent representation. The Defendant's motion for summary judgment will be denied with respect to the Plaintiff's fraudulent representation claim.

### III.  Civil Conspiracy

Indiana law recognizes a cause of action for damages resulting from a conspiracy. *Indianapolis Horse Patrol, Inc. v. Ward*, 217 N.E.2d 626, 628 (Ind. 1966). A conspiracy is defined as "a combination of two or more persons, by concerted action, to accomplish an unlawful purpose or to accomplish some purpose, not itself unlawful, by unlawful means." *Id.* (citations omitted). Civil conspiracy is not an independent cause of action, but must be pled with an underlying tort. *Heyser*, 933 N.E.2d at 20 (citing *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1234 (Ind. 1994)).

The Defendant argues that summary judgment should be granted against the Plaintiff on its underlying tort claim—fraudulent misrepresentation—and accordingly, summary judgment should be granted against the civil conspiracy claim as well. Because the Court concludes that the Plaintiff provided sufficient evidence to survive summary judgment on its fraudulent misrepresentation claim, the civil conspiracy claim survives as well. The Defendant's Motion for Summary Judgment will also be denied with respect to that claim.

## CONCLUSION

For the foregoing reasons, the Court DENIES the Defendant's Motion for Summary Judgment [ECF No. 71], and DENIES the Plaintiff's Motion to Strike [ECF No. 80].  The Court SETS a telephonic status conference for February 17, 2015, at 10:00 AM. The Court will initiate the call.

SO ORDERED on January 14, 2015.

  s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT